Gardner's Administrator *v.* Schooley.

GARDNER'S ADMINISTRATOR *vs.* SCHOOLEY and others.

1. A mere promise by a father to reward a daughter for her faithful discharge of her filial duties, in the absence of any contract or legal obligation on which an implied promise to pay her can be based, is not such an agreement as will support a mortgage subsequently executed to her, against the father's creditors.

2. The law will not imply a promise on the part of a parent to pay a daughter for services rendered by her in his household.

On final hearing, bill and cross-bill, answers, replications and proofs.

*Mr. John T. Bird,* for complainant.

*Mr. E. P. Conklin,* for defendant, John J. Creveling.

*Mr. M. Wyckoff,* for Sarah A. Schooley.

THE CHANCELLOR.

The bill is filed to foreclose two mortgages, held by the complainant, and given by Jediah Schooley, late of Bloomsbury, in the county of Hunterdon, now deceased, on a house and lot there, owned by him. The first was given to Henry Gardner and William S. Gardner, on the 21st of March, 1869, to secure the payment of $185.20, and by them it was assigned to the complainants' intestate. The second was given on the 1st of April, 1871, to the complainant's intestate to secure the payment of $120. The property was, at the time of executing the first of these mortgages, subject to a mortgage given by Jediah Schooley to William Creveling for $1000, and interest. After giving the first of the complainant's mortgages, Jediah Schooley executed a mortgage, dated December 28th, 1869, on the property for $1000 and interest, to his daughter, Sarah A. Schooley, and on the 6th of April, 1870, he

executed another mortgage for $246, to Robinson and Hoff, who assigned it to John J. Creveling, by whom it is now held. All these mortgages are still subsisting.

The controversy between the parties, relates only to the mortgage of Sarah A. Schooley, which the complainant and John J. Creveling (the latter of whom filed a cross-bill attacking it,) insist was voluntary and designed to hinder and defeat the creditors of Jediah Schooley. Her answer, which is under oath according to the requirement of the bill, alleges that it was given to secure an indebtedness of $1000, from her father to her for her work, labor, care, diligence and nursing for him, and for money by her lent and advanced to, and paid out and expended for him. It appears, however, from her testimony in the cause, that the mortgage was not given in consideration of any money lent or paid, but only, as she alleges, for her services in taking care of her father's house, rendered between 1858 or early in 1859, and the date of the mortgage. She testifies, that in 1858, she, being then about eighteen years old, went away from her home in Bloomsbury to learn a trade; that she remained away about three months, when her mother's illness made it necessary that she should return home to take charge of the affairs of the household; and that she returned accordingly and thenceforward remained at home, devoting her time and services to the family, taking charge of the household, washing, ironing, mending, &c. Her mother died in March, 1863. Her father was a day laborer, working on the railroad and dependent on his labor for his support. He was possessed of no property, except the mortgaged premises, a house and lot of one quarter of an acre, and some household goods, but not enough, however, to furnish his house, the best part of the furniture in the house having been provided by some of his sons, who lived with him as part of the family. After the death of his wife, his family consisted of himself, his mother, and his four sons and two daughters. Three of the sons appear to have been past their majority. They nevertheless lived with their father, making his house their home. They paid no board,

nor did they make any compensation for their washing, mending, &c., which were done by Sarah, there, but retained all their earnings for their own use. Her services were to no inconsiderable extent rendered to them. Two of them, with her father, furnished her clothing. She continued from the time of her return in 1858 or 1859, thus to live in the family, until after her mortgage was given.

The debts of the complainant and that of the defendant, John J. Creveling, were contracted for groceries and other necessaries, furnished for use in the family, the purchases having been made by Sarah herself. The credit was given to her father. The proof of the consideration of the mortgage to Sarah, is by no means such as to establish the mortgage as against the creditors of her father. On the other hand, it leads to the conclusion that that instrument was without consideration, and was designed to hinder and defeat his creditors. She neither proves nor alleges that there was any agreement for compensation between her and him until within about a year before the execution of the mortgage, and what she refers to in that connection appears to be his promise, that if his life was spared he would give her something to show for her services. · This promise he is said to have made on an occasion when her eldest brother remarked in the course of a conversation in the family, that he had a lot of land which he had bought with his own earnings, to show for his work, and she said she had worked longer than he and had nothing to show for it, and thereupon her father made her the promise above mentioned. Except this there is no evidence of any agreement between her and her father for compensation, and this is not evidence of any such agreement as will support the mortgage against his creditors. It was his promise to reward her, if in his power, for her faithful discharge of her filial duty. She never made any demand for payment, nor did she ever receive anything on account.

There was no contract, and there appears to have been no legal obligation on which an implied promise in this case can be based. The mortgage appears to have been made without

consultation with her, and without any knowledge on her part of her father's intention to make it. There was no account, nor any reckoning between them. He appears not even to have consulted her as to the amount for which the mortgage should be made. He went to Phillipsburg and had the mortgage drawn there, and there he executed it. When it was delivered she gave no receipt nor any credit for it. After it was delivered to her, however, she seems to have made up an account, (all the entries of which she says she made at one time, and on which no credit is given,) of her wages, from March 5th, 1863, when her mother died, to the 5th of December, 1869, at $2.75 per week, with interest for one year on $852, the gross amount of these wages, according to her account, up to March 5th, 1869. Why this account was thus made up, she seems unable to explain. In the book which contains it, and which she produced on her examination, there is another account of her services, in which her wages are charged at $2.75 a week up to March 5th, 1866, and after that at $3 a week, and her father is credited with cash, $35, under date of March 5th, 1864, and $42, under date of March 5th, 1865. She says she had no knowledge of the existence of this account until she produced the book on her examination, and that she does not know what the entries in it were intended for, unless it was that one of her brothers intended by them to make out a bill for her. She admits that the credits in that account are fictitious. This book proves to be the pass-book of her father's dealings with Robinson and Hoff, containing the items of her purchases of groceries and like necessaries from them, for the amount of which their mortgage, now held by John J. Creveling, was given, and all of which was due when her mortgage was made. It may be remarked, that she admitted in her testimony that she knew when she received her mortgage, that there was a debt of like character with that of Robinson and Hoff, due from her father to Theodore Gardner. The account which she thus made up after the mortgage was given to her, amounts, without interest, to only

$852, while the mortgage was given for $1000, and it may be observed that in her testimony she says that the consideration of the mortgage was her services alone, making no mention of interest. The evidence leads me to the conclusion that the services rendered by her, were not rendered in pursuance of any contract or agreement between her and her father for compensation therefor. Nor will the law imply any promise to pay for services rendered by a daughter to her father under such circumstances as the case presents. She returned to her father's house while she was yet a minor, to live in and be part of his family, and she so continued, unemancipated, until after her mortgage was given. Her mortgage must be held to have been without consideration, and fraudulent as against creditors. *Ridgway* v. *English,* 2 *Zab.* 409; *Updike* v. *Titus,* 2 *Beas.* 151; *Coley* v. *Coley,* 1 *McCart.* 350; *Updike* v. *Tenbrook,* 3 *Vroom* 105; *Prickett* v. *Prickett's Adm'rs,* 5 *C. E. Green* 478. It will be postponed in favor of the mortgage held by John J. Creveling, and the mortgage given to Theodore Gardner, for $120, and interest. The priority of the other mortgages over hers is admitted.